UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRIEDEL M. ACKER,

       Plaintiff,

vs.
                                 Case No. 06-CV-14467
                                 HON. GEORGE CARAM STEEH

WORKHORSE SALES CORPORATION,

       Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#50)

Defendant Workhorse Sales Corporation moves for summary judgment of plaintiff Friedel Acker's claim under Michigan's Elliott Larsen Civil Rights Act (ELCRA), M.C.L. §§ 37.2201, et seq., that he was discharged in a reduction in force (RIF) as a pretext for age discrimination. A hearing on the motion was held on December 10, 2007.

The questions raised are purely issues of state law, inasmuch as federal jurisdiction in predicated only on diversity of citizenship. For the reasons set forth in more detail below, the court finds that plaintiff Acker has failed to raise a genuine dispute that defendant Workhorse terminated him as part of a bona fide RIF. Because Mr. Acker lost nearly all of his international sales accounts and prospects in the months before his termination, he is unable to refute his employer Workhorse's assessment that elimination of his sales position would have no impact on future sales; Mr. Acker cannot establish that the reasons proffered by Workhorse for his termination were insufficient to justify his discharge and were a pretext for age discrimination. Workhorse's motion for summary judgment will be GRANTED.

## I. Background

Workhorse manufactures "strip-chassis" for motor homes and commercial vans. Acker was employed as Workhorse's Government and Export Sales Manager from 1998 until he was discharged on January 31, 2006. Acker began working for Workhorse after retiring from the General Motors Corporation as a chassis sales representative. Workhorse President David Olsen directed Acker's supervisor, Vice President of Commercial Sales Jay Sandler, to choose two employees from Sandler's staff for termination as part of a late 2005 RIF. From a staff of ten, Sandler chose Acker, age 64, and Dan O'Connell, age 51. A total of seven Workhorse employees were terminated, with previous RIFs taking place in 2004 and early 2005.

Acker's age discrimination claim focuses on statements allegedly made by Sandler during Acker's tenure at Workhorse, statements which must all be taken as having been made for purposes of this motion. Deposition testimony of Acker and former Workhorse sales representatives Dan O'Connell, Steve O'Connor, and Shay DeReamer reflect:

- Sandler stated at several sales meetings, as late as 2005, that "the chassis are as old as Fred Acker";

- O'Connell testified that Sandler's nickname for Acker was "the old-fucker," and used the nickname behind Acker's back at least a year before Acker's termination;

- O'Connell testified that Sandler indicated two years before Acker was terminated that Sales Representative Bob Senak "was old and senile," "was way too old, [and] he should have been fired from [former employer] General Motors";

- O'Connell testified that he was told by Sandler that he, O'Connell, was "too old to change jobs or find a new job," and was "already old";

- O'Connell testified that, when he protested to Sandler about the rehiring of Loren Luke, Sandler replied: "Dan, all I care about is he's [Luke's] young and he closes the deal";

- O'Connor testified that at a June 2002 Chicago sales meeting when Acker and Senak walked out of the room, Sandler made the comment that "part of the problem with the organization were the old guys like that";

- DeReamer testified that Sandler told him during his 2001 job interview that he wanted "young and aggressive employees like [DeReamer]" and "was looking to replace some retired GM guys that he had."

Acker also proffers O'Connell's, O'Connor's, and DeReamer's opinion testimony that Sandler favored 39-year old sales representative Loren Luke, assigning Luke more lucrative customer accounts. Acker testified that he asked Sandler for the profitable Frito-Lay account in 2004 when fellow sales representative Bob Senak retired, yet Sandler assigned the account to Luke. As evidence that the economic RIF was merely a pretext for age discrimination, Acker relies on Workhorse's hiring of 33-year old Jason Rader as Eastern Regional Sales Manager about 15 months after Acker was terminated, and a letter informing Rader that "Workhorse and International have had record success in the past several years." Acker also argues he was treated differently than younger sales representatives when Sandler forbid him from working out of his Florida home.

## II. Summary Judgement

Workhouse moves for summary judgment arguing that Sandler's alleged statements are not direct evidence of discrimination because they are too ambiguous, abstract, and isolated from Acker's January 2006 discharge to require a reasonable juror to conclude that age was a determining factor in the decision to discharge Acker. Workhorse continues that the alleged statements are also too stray, abstract, and temporally remote from Acker's discharge to constitute circumstantial evidence of age discrimination. Workhorse proffers evidence that Acker's position of Government and Export Sales Manager was chosen for elimination because Workhorse lost several sales accounts assigned to Acker, including Mexican clients Bimbo and Sabritas, Canada Post, and the federal General Services

3

Administration (GSA). Workhorse also proffers Sandler's testimony that Acker would not have been discharged had he secured potential Venezuelan business in late 2005. Workhorse points out that it is undisputed that Acker was not replaced by Luke, Rader, or anyone else, but instead, Acker's accounts were assigned among remaining sales employees. Workhorse argues that customer accounts were consistently assigned according to a sales representative's "vocation," explaining why Luke, whose vocation was "baking and snack foods," was assigned the Frito-Lay account instead of Acker, whose vocation was government and foreign sales. Workhorse denies that Acker was treated differently than any similarly situated employee.

### A. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by the use of materials specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party

must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800.

### B. Michigan's ELCRA

Michigan's ELCRA prohibits an employer from discharging an employee because of their age. M.C.L. § 37.2202(1)(a). A plaintiff may establish a prima facie case of discrimination under the ELCRA either by presenting direct evidence of intentional discrimination or by showing the existence of circumstantial evidence which creates an inference of discrimination. Blair v. Henry Filters, Inc., 505 F.3d 517, 523 (6th Cir. 2008). Hoffman v. Sebro Plastics, 108 F. Supp. 2d 757, 765 (E.D. Mich. 2000). Direct evidence of unlawful discrimination is evidence that, if believed, "requires the conclusion that unlawful discrimination was at least a motivating factor" in the challenged employment decision. Harrison v. Olde Financial Corp., 225 Mich. App. 601, 610, 572 N.W.2d 679 (1988). Direct evidence is defined as "evidence that proves the existence of fact without requiring any inferences." Blair, 505 F.3d at 523 (quoting Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 548 (6th Cir. 2004)). In direct evidence cases, the burdens of production and persuasion shift to the employer to prove that it would have discharged the employee even if it had not been motivated by unlawful discrimination. Blair, 505 F.3d at 523; In re Rodriguez, 487 F.3rd 1001, 1007 (6th Cir 2007).

Absent direct evidence of unlawful discrimination, the framework set forth by the

Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), requires the ELCRA plaintiff to establish a prima facie case that: (1) he is a member of the protected class; (2) he suffered an adverse employment action such as discharge; (3) he was qualified for the position; and (4) he was discharged under circumstances giving rise to a reasonable inference of unlawful discrimination. Blair, 505 F.3d at 524; Lytle v. Malady (On Rehearing), 458 Mich. 153, 172, 573 N.W.2d 906 (1998). If the prima facie showing is made, the employer has the burden of producing evidence of a legitimate reason for the discharge. Blair, 505 F.3d at 524; Town v. Michigan Bell Telephone Co., 455 Mich. 688, 695, 568 N.W.2d 64 (1997). If the employer was involved in a bona fide RIF when the challenged discharge decision took place, the employer's burden of production is met, and the presumption of discrimination arising from the prima facie case is effectively rebutted. Lytle, 458 Mich. at 177-178. Once the employer meets the burden of production, the plaintiff is required to proffer evidence that the employer's nondiscriminatory reason was not the true reason for the discharge, but a mere pretext for discrimination, and that the plaintiff's age was a motivating factor in the discharge decision. Blair, 505 F.3d at 524; Town, 455 Mich. at 697; Lytle, 458 Mich. at 177-178.

**C. Analysis**

**i. Direct Evidence**

Construing Sandler's alleged statements in a light most favorable to Acker, reasonable jurors would not be required to conclude that Acker's age was a motivating factor in the decision to discharge Acker in late 2005, and therefore the statements are not direct evidence of age discrimination. Harrison, 225 Mich. App. at 610. Statements made by a decision maker unrelated to the employment decision at issue, that is, statements that are isolated, ambiguous, or remote in time relative to the challenged employment decision,

6

do not constitute direct evidence of unlawful discrimination. Blair, 505 F.3d at 525; Millner v. DTE Energy Co., 285 F. Supp. 2d 950, 966 (E.D. Mich. 2003) (citing Wells v. New Cherokee Corp., 58 F.3d 233, 237-38 (6th Cir. 1995); McCarthy v. Kemper, 924 F.2d 683, 686-87 (7th Cir. 1991); Harrison, 225 Mich. App. at 608 n.7; Hatmaker v. Xerox, 1998 WL 1991212, at *3 (Mich. App. 1998); Foster v. Tweedle Litho Co., 2002 WL 207575, at *1 (Mich. App. 2002) (citing Krohn v. Sedgwick James of Michigan, Inc., 244 Mich. App. 289, 297-300, 624 N.W.2d 212 (2001))). Sandler's alleged statements that "the chassis are as old as Fred Acker" and that Acker was "the old-fucker" are ambiguous relative to any discharge decision. Sandler's alleged June 2002 statement that "part of the problem with the organization were the old guys" like Acker and Senak is too remote in time to require a conclusion that Acker's late 2005 discharge was motivated in part by Acker's age. Sandler's alleged 2001 interview statements to DeReamer that Sandler wanted "young and aggressive employees" and was "looking to replace some retired GM guys that he had" are ambiguous and remote in time with respect to the 2005 discharge decision. Sandler's alleged comments about Bob Senak and Dan O'Connell being "old and senile," "too old," and "already old" were not directed at Acker. Sandler's alleged statement to O'Connell that "all I care about is he's [Luke's] young and he closes the deal" is also not directed at Acker, and is likewise ambiguous relative to the 2005 discharge decision. Sandler's alleged statements do not constitute direct evidence of age discrimination because they were not made in relation to the decision to discharge Acker in the RIF, and they require an inference that age animus may have motivated the discharge decision. See Blair, 505 F.3d at 523 (quoting Rowan, 360 F.3d at 550).

### ii. Indirect Evidence

Construing Sandler's alleged statements in a light most favorable to Acker,

reasonable jurors could conclude that Acker has established the fourth element of his prima facie case under the McDonnell Douglas framework by demonstrating that he was discharged under circumstances creating a reasonable inference that unlawful age discrimination was at least a motivating factor in Sandler's decision to discharge Acker. Blair, 505 F.3d at 529; Lytle, 458 Mich. at 172.

> [W]hen assessing the relevancy of an alleged biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus. Cf. Wells [v. The New Cherokee Corp., 58 F.3d 233, 237 (6th Cir. 1995)] (holding manager's discriminatory remark indicative of age bias where buttressed by other evidence of discrimination and thus remark was not an isolated comment).

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 356 (6th Cir. 1998). Michigan courts have applied federal precedent in analyzing the probative value of discriminatory remarks. See Krohn, 244 Mich. App. at 297-300; Harrison, 225 Mich. App. at 608 n.7.

According to the deposition testimony of Acker, O'Connell, O'Connor, and DeReamer, Sandler made multiple age-biased remarks over the course of several years, and the court does not review those remarks in isolation. Blair, 505 F.3rd at 530; Ercegovich, 154 F.3d at 356. Contrary to Workhorse's argument, reasonable jurors could conclude that Sandler's alleged statements were not so stray or ambiguous as to preclude an inference that Sandler maintained an age-related bias during Acker's career. Id. A reasonable inference may be drawn from Sandler's several remarks concerning Bob Senak ("way too old, and he should have been fired from General Motors"), O'Connell ("too old to change jobs or find a new job"), Luke ("all I care about is he's young and he closes the deal"), Acker and Senak ("part of the problem with the organization were the old guys like that"), and DeReamer (wanting "young and aggressive employees" and "looking to replace

8

some retired GM guys") that Sandler consistently entertained discriminatory employment animus towards those he considered "old"; Sandler's alleged nickname for Acker shows Sandler perceived Acker as being "old." The weight and frequency of the alleged comments would allow a reasonable jury to conclude that Sandler's discriminatory animus did not dissipate by the time Sandler chose Acker for discharge in late 2005. Blair, 505 F.3rd at 530; Ercegovich, 154 F.3d at 356.

It is beyond dispute that Acker has also met his burden of establishing the remainder of his prima facie case, that is, at age 64, Acker was a member of the class of persons protected from age discrimination, he suffered the adverse action of an employment discharge, and he was qualified for his sales position, having worked as a Workhorse sales representative from 1998 through 2005 after retiring from General Motors as a chassis sales representative. Blair, 505 F.3d at 524; Lytle, 458 Mich. at 172. "A court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered nondiscriminatory reasons for discharge." Cicero v. Borg-Warner Automotive, Inc., 280 F.3d 579, 585 (6th Cir. 2002). Independent of Workhorse's proffered legitimate reasons for choosing Acker for discharge, reasonable jurors could conclude on this record that Acker remained qualified as a chassis sales representative.

### iii. RIF and Pretext

In response to Acker's prima facie case of age discrimination, Workhorse has met its burden of production by demonstrating that Workhorse was involved in a bona fide RIF when Acker was discharged. Blair, 505 F.3d at 524; Lytle, 458 Mich. at 177-178; Town, 455 Mich. at 695. The record evidence shows that Workhorse was purchased by International Truck and Engine Corporation in August of 2005, prompting Workhorse to hire a consulting firm to assist in reducing costs and integrating Workhorse into International's

business, culminating in three RIFs. Workhorse President David Olsen's March 7, 2007 Transcript, at 31-33; Workhorse HR Director Fegter's March 20, 2007 Transcript, at 10. The undisputed evidence also shows that Workhorse "broke-even" in 2005, and lost $25.0 million in profit in 2006, the year after Acker was discharged. Olsen March 7, 2007 Transcript, at 117. In addition to Acker and O'Connell, at least five other Workhorse employees were discharged in the December 2005 through January 2006 RIF. Defendant's November 19, 2007 Exhibit K. Workhorse's March 1, 2007 offer letter to potential new-hire Jason Rader stating that "Workhorse and International have had record success in the past several years" falls well short of rebutting Workhorse's proffered evidence that the late 2005 RIF was a bona fide RIF. Compare Blair, 505 F.3rd at 533 (finding lack of an objective plan for a RIF coupled with other circumstantial evidence rebutted evidence of a bona fide RIF). Consistent with a RIF, Acker concedes that he was not replaced. Acker November 12, 2007 Transcript, at 170-171. See Lytle, 458 Mich. at 178 (explaining that an employee is not "replaced" when his job duties are reassigned to remaining employees following a bona fide RIF); Blair, 505 F.3d at 522 (recognizing that the plaintiff employee's accounts were assigned to one remaining sales person, and a man in his twenties was hired to work in sales four months after the plaintiff's discharge).

By establishing that a bona fide RIF took place in late 2005, Workhorse has shifted the burden to Acker to proffer evidence that would allow a reasonable jury to find that Workhorse's proffered legitimate reasons for choosing Acker for discharge were merely a pretext for age discrimination, and that Acker's age was at least a motivating factor in the discharge decision. Blair, 505 F.3d at 524; Town, 455 Mich. at 697; Lytle, 458 Mich. at 177-178. Three ways to establish pretext are: (1) showing that the reasons proffered by the employer have no basis in fact; (2) if the reasons have a factual basis, that they are not

the actual factors that motivated the discharge decision; or (3) if the proffered reasons were factors, the reasons were nonetheless insufficient to justify discharge. Dubey v. Stroh Brewery Co., 185 Mich. App. 561, 565-66, 462 N.W.2d 758 (1990).

Sandler testified that he chose to eliminate Acker's position based on "impact of future unit sales," explaining:

> A. [by Sandler] Because of the major accounts that Mr. Acker has been representing, one of them being General Motors Mexico, we were no longer doing any business with that account, and there was not much of an opportunity to do business with them in the future. In fact, in all - - just about all the cases where we were doing business in what we called export or overseas or international accounts at that point, we had very little prospects of doing business with in [sic] the short term or even medium term.
>
> We had lost all the business in Mexico. There was no prospect of getting it back short term or medium term. We were not doing business anywhere else internationally. In fact, the date of termination was delayed significantly based upon a project in Venezuela; and had that Venezuela project culminated into significant business that it had potential to, he probably - - his position would not have been eliminated. But when that business became clear it wasn't going to result in any orders or anything going forward, then we eliminated the position.
>
> *   *   *
>
> A. [Sandler, continuing] Eliminating that position would not have a future impact on sales.

Sandler October 12, 2007 Transcript, at 120-121.

To establish pretext, Acker begins by arguing that Sandler's alleged statements and favorable treatment of younger sales representatives demonstrate that Sandler was predisposed to age discrimination. State law requires Acker to proffer evidence that Sandler was not only predisposed to discriminate on the basis of age, but "actually acted on that disposition in discharging him." Reisman v. Regents of Wayne State University, 188 Mich. App. 526, 538, 470 N.W.2d 678 (1991). Stated differently, Acker must proffer evidence that his age was actually a motivating factor in the discharge decision. Blair, 505

11

F.3d at 524; Town, 455 Mich. at 697; Lytle, 458 Mich. at 177-178.

The March 2007 hiring of 33 year-old Jason Rader as Eastern Regional Sales Manager more than a year after Acker was discharged does not support an inference of age discrimination or pretext. Acker has not come forward with evidence that Rader's position as Eastern Regional Sales Manager replaced Acker's position of Government and Export Sales Manager. Further, Acker has admitted that he was not replaced following the late 2005 RIF. Acker November 12, 2007 Transcript, at 170-171. Lytle, 458 Mich. at 178. The situation is not comparable to that in Blair, where the plaintiff's accounts were reassigned to one remaining sales person, and a younger sales representative was hired four months after the plaintiff's purported RIF inspired discharge. Blair, 505 F.3d at 522.

Sandler's assignment of accounts to the younger Loren Luke also does not support a finding of age discrimination or pretext. Daniel O'Connell, a former Workhorse sales representative, testified that Sandler enticed Luke to return to work at Workhorse, and then assigned Luke the lucrative Frito Lay account. O'Connell June 28, 2007 Transcript, at 14-16. Steven O'Connor, another former sales representative, testified that he observed Sandler assign Luke "many key accounts." O'Connor June 15, 2007 Transcript, at 8. Workhorse sales representative Shay DeReamer testified that "it was pretty common knowledge among all of the salespeople" that Luke was being distributed the "better accounts" by Sandler. DeReamer April 20, 2007 Transcript, at 12. A lay witness's opinion on the ultimate issue of whether unlawful discrimination existed in the workplace seldom meets the Federal Rule of Evidence 701 test of being helpful to the jury because the jury's opinion as drawn from the factual foundation for the opinion is as good as the witness's opinion. Mitroff v. Xomox Corp., 797 F.2d 271, 276 (6th Cir. 1986). The only "lucrative" account assigned to Luke and factually identified by the deponents is the Frito Lay account.

Acker does not dispute that, as Government and Export Sales Manager, his responsibilities included export accounts and government accounts, while Luke's responsibilities included snack food and baking accounts. Acker October 12, 2007 Transcript, at 26-27; Sandler October 12, 2007 Transcript, at 163. Consistent with his responsibilities, Acker acknowledged that he was assigned and responsible for sales to the foreign division of Frito Lay, the Sabritas account. Acker October 12, 2007 Transcript, at 62, 127-128. Given this undisputed evidence, reasonable jurors could not legitimately infer age discrimination from the assignment of the Frito Lay account to Luke. Compare Blair, 505 F.3d at 521 (recognizing evidence that the plaintiff's profitable Ford account was reassigned to a thirty-three-year-old salesperson, and the plaintiff was assigned the younger salesperson's unproductive GM account, because the plaintiff was told he was "too old" to work the Ford account). The remaining opinions inferring that Sandler engaged in a pattern of unlawful age discrimination lack foundation, and do not meet the criteria of Rule 701. Mitroff, 797 F.2d at 276.

Sandler's asserted refusal to allow Acker to work out of his Florida home does not raise an inference of age discrimination or pretext. To establish disparate treatment, Acker was required to proffer evidence that he was treated differently than younger sales representatives for the same or similar conduct. Meagher v. Wayne State University, 222 Mich. App. 700, 709, 565 N.W.2d 401 (1997). Sandler explained that Tracey Murrin, age 30, was permitted to work out of her home after Workhorse's Chicago office closed. Sandler June 7, 2007 Transcript, at 54. DeReamer, age 27, testified that he was permitted to work from his home in Valparaiso, Indiana upon being hired in 2001. DeReamer April 20, 2007 Transcript, at 6, 8. In contrast, Acker was hired in 1998, and worked out of an established Workhorse office in Troy, Michigan, near his home in Birmingham, Michigan.

Sandler June 7, 2007 Transcript, at 55. Sandler's response to a hypothetical question that he would not have allowed Acker to work out of his Florida home "if Mr. Acker had moved full-time to Florida . . . and sold his Birmingham residence" poses a distinctly different situation than that of Murrin, whose Workhorse office was closed, or DeReamer, who was never assigned to work at a Workhorse office. Meagher, 222 Mich. App. at 709. Acker's desire to move away from his assigned Michigan office to live in Florida, yet continue working as Workhorse's Government and Export Sales Manager while the position remained based in Troy, Michigan, differs from the circumstances faced by Murrin and the home assignment initially given to DeReamer. There is also a lack of evidence indicating that Sandler approved DeReamer's home assignment, or that Workhorse maintains an office near Valparaiso, Indiana.

In an effort to show that the lack of future business was not the actual factor motivating Sandler's discharge decision, Acker relies upon Workhorse President David Olsen's testimony that Sandler gave him three reasons for the decision: "loss of market due to change of product, loss in customer due to [Acker's] actions or lack thereof, and general difficultness in -- difficulty in how he interacted . . . ." Olsen March 7, 2007 Transcript, at 46. Olsen referred to Acker's disobedience to a "very direct request" by Sandler that Acker work out of his Troy, Michigan office rather than a Florida home. Id at 46. Acker points to the following testimony of Sandler as contradictory:

> Q. So all of this about the Florida residence issue and -- that had nothing to do with the decision to let [Acker] go; is that correct?
>
> A. [by Sandler] That's correct. He was let go because his position was eliminated.

Sandler June 7, 2007 Transcript, at 127. Sandler went on to clarify:

> Q. And you said he was cantankerous, he was --

>     A. [by Sandler] There were underlying factors that when you look at those things and you look at the person that support making the decision, but the primary decision was elimination of a position because of lack of business.
>
>     Q. So the fact that you claim he was cantankerous, was not a team player, these were irrelevant to the decision to terminate him; correct?
>
> \* \* \*
>
>     THE WITNESS [by Sandler]: I didn't say they were irrelevant. I said they were not the primary drivers in the decision-making process.
>
>     BY MR. STERLING [Acker's Counsel]:
>     Q. But if he had the Venezuelan business, regardless of the fact that he was not a team player, you would have kept him; right?
>
> \* \* \*
>
>     THE WITNESS: Likely.
>
>     BY MR. STERLING:
>     Q. So they were irrelevant?
>
>     MR. NECKERS [Workhorse's Counsel]: You are arguing with him.
>
>     BY MR. STERLING:
>     Q. They were very minor factors, you are saying?
>
>     A. I didn't say that. You said that. I said they were a factor. They were not the primary factor.

Id at 127-128. Any reasonable reading of Olsen's and Sandler's depositions fails to support an inference that the true reason for Acker's discharge was anything other than the lack of future business, or that Acker's age was a motivating factor in the decision to eliminate his position of Government and Export Sales Manager. In short, Olsen's and Sandler's testimony are consistent with Workhorse's proffered reason for discharging Acker, that eliminating Acker's position would not affect future sales.

Acker does not dispute the loss of his major sales accounts with Bimbo, Sabritas, Canada Post, and the GSA in 2005, or the failure to secure future business in Venezuela. Acker October 12, 2007 Transcript, at 62-89, 103. 127-128, 197, 201. Workhorse

15

Commercial Order Summaries show a corresponding decline in units sold by Acker: 1202 units in 2002; 1072 units in 2003; 269 in 2004, and 405 units in 2005. Plaintiff's Exhibit O. Acker argues that he was not at fault for losing the accounts, that he was not given enough time to secure the Venezuelan business, and that he would have accomplished more sales under an age-neutral assignment of accounts. As reasoned above, Acker has not come forward with sufficient evidence to support a finding that account assignments were made on an unlawful discriminatory basis. Workhorse does not maintain that Acker was discharged due to his poor performance resulting in a loss of business. Rather, Workhorse's proffered reason for discharging Acker is that his position of Government and Export Sales Manager was eliminated due to a lack of future business in the "vocation" of government and foreign sales, independent of the reasons for the loss of government and foreign accounts. There is no evidence in the record to support Acker's implication that Sandler somehow sabotaged Acker's accounts to create a pretext for his discharge. Compare Blair, 505 F.3d at 521. Acker's argument that he was not given enough time to secure the Venezuelan business is undercut by Sandler's unrebutted testimony that the deal never closed, even after Acker was discharged, due to problems with pricing and customer product specifications. Sandler June 7, 2007 Transcript, at 123-124.

Acker's argument that Sandler's failure to reassign him to another sales position demonstrates pretext and age discrimination is without merit. While an employer's business judgment is not an absolute defense, courts must inquire into "whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Wexler v. White's Fine Furniture, 317 F.3d 564, 576 (6th Cir. 2003) (quoting Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir. 1998)) (emphasis omitted). Workhorse has met its burden of demonstrating it was conducting a bona fide economic

RIF when it discharged Acker. Reassigning Acker would not have accomplished Workhorse's goals of reducing costs. Olsen March 7, 2007 Transcript, at 31-33; Fegter March 20, 2007 Transcript, at 10. Consistent with the bona fide RIF, it was reasonable for Workhorse to discharge Acker rather than transfer him to another position. As held in an analogous situation involving the federal Age Discrimination in Employment Act (ADEA), "an employer has no duty to transfer an employee to another position within the company when the employer reduces the work force for economic reasons." Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 374 (6th Cir. 1999). Acker has not come forward with evidence that a younger, similarly situated sales representative was permitted to transfer to another sales position to avoid termination in the RIF. See Bender v. Hecht's Department Stores, Inc., 455 F.3d 612, 623 (6th Cir. 2006) (recognizing that a prima facie ADEA claim of a denial of opportunity to transfer requires proof that a similarly situated employee outside the protected class was offered a transfer).

Acker attempts to establish pretext by noting that, of the seven persons discharged in late 2005, he was the oldest at age 64, and O'Connell was age 51. Acker has not proffered evidence of Workhorse's reasons for discharging O'Connell or the others discharged in late 2005. Nor has Acker proffered evidence indicating a statistical age-relevance with respect to the late 2005 RIF or previous RIFs. See Amini v. Oberlin College, 440 F.3d 350, 359 (6th Cir. 2006) (quoting Rocha v. Great Am. Ins. Co., 850 F.2d 1095, 1101 (6th Cir. 1998) for the proposition that "for statistics to be valid and helpful in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.").

Construed in a light most favorable to Acker, Acker has failed to come forward with evidence to rebut Workhorse's proffered legitimate reason for discharging him, that is, that

Acker's position of Government and Export Sales Manager was eliminated due to the loss of government and foreign accounts. Amway Distributors, 323 F.3d at 390; McLean, 224 F.3d at 800; Blair, 505 F.3d at 524; Dubey, 185 Mich. App. at 565-66. Acker's proffered evidence does not support a reasonable finding that Sandler used the 2005 RIF as a pretext for age discrimination by acting on a predisposition of age-bias and relying on Acker's age as a motivating factor to discharge him. Id; Town, 455 Mich. at 697; Lytle, 458 Mich. at 177-178; Reisman, 188 Mich. App. at 538. Viewed in light of Workhorse's proffered reasons for choosing Acker for discharge as part of a bona fide RIF, Sandler's alleged age-biased remarks are insufficient to establish pretext or age discrimination. Id; Cicero, 280 F.3d at 588 (recognizing that the presumption of discrimination falls away when the employer proffers sufficient evidence of a legitimate, non-discriminatory reason for the discharge). See also Town, 455 Mich. at 697 (recognizing that if the employer meets its burden of production, "the employee must submit admissible evidence to prove that the employer's nondiscriminatory reason was not the true reason for the discharge and that the plaintiff's age was a motivating factor in the employer's decision."). Even assuming Sandler's statements constituted direct evidence of discrimination, Workhorse would be entitled to summary judgment because it is beyond dispute on this record that Acker would have been discharged in the RIF even if Workhorse had not been motivated by unlawful discrimination. Blair, 505 F.3d at 523; In re Rodriguez, 487 F.3d at 1007.

The court is aware that a finding of intentional and unlawful discrimination may be raised by the evidence supporting the prima facie case as well as the evidence used to discredit the employer's proffered rationale. Blair, 505 F.3d at 532 (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-149 (2000). Here, however, although Sandler's alleged age-biased statements were sufficient to create a prima facie

case, the statements combined with the unrebutted evidence of a bona fide RIF and Workhorse's legitimate reasons for choosing Acker for discharge would not permit a reasonable trier of fact to conclude that Acker's age was a motivating factor in the discharge decision. Blair is distinguishable on its facts, involving evidence of age discrimination beyond that of age-biased comments made by the decision-maker, including evidence that the Blair decision-maker reassigned accounts on the basis of age bias before the plaintiff was discharged, that a younger employee was hired only four months after the purported RIF, and that the defendant company lacked an objective plan for the purported RIF. See Blair, 505 F.3d at 521-522, 533-534.

### III. Conclusion

Workhorse's motion for summary judgment is hereby GRANTED. Plaintiff Friedel Acker's ELCRA claims are hereby DISMISSED with prejudice.

SO ORDERED.

Dated: April 28, 2008

>s/George Caram Steeh
>GEORGE CARAM STEEH
>UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on April 28, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

---